IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| THE UNIVERSITY OF TEXAS M.D. ANDERSON CANCER CENTER, BY AND THROUGH THE BOARD OF REGENTS OF THE UNIVERSITY OF TEXAS SYSTEM, | § § § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No.16-3155 |
| NANTHEALTH, INC.; NANTWORKS, LLC; NANT HOLDINGS IP, LLC; and DR. PATRICK SOON-SHIONG, | § § § § § | |
| Defendants. | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff The University of Texas M.D. Anderson Cancer Center, by and through The Board Of Regents of The University Of Texas System (MD Anderson), files this its First Amended Complaint, against NantHealth, Inc., NantWorks, LLC, Nant Holdings IP, LLC, and Dr. Patrick Soon-Shiong (Defendants), and alleges the following:

## INTRODUCTION

1.     MD Anderson hardly needs an introduction.  It is a state agency and therefore not-for-profit, award-winning philanthropic-directed leader in cancer research, treatment, and education founded and headquartered in Houston, Texas, although its success in treating cancer is felt across the United States and globally as one of its marks (shown below) famously illustrates:

# THE UNIVERSITY OF TEXAS
# MDAnderson
## ~~Cancer~~ Center

Making Cancer History®

2.      In 2012, following the vision of its president Dr. Ron DePinho (DePinho), MD Anderson created and, since that time, has continuously used various trademarks (collectively referred to as "Moon Shots") to describe an innovative, game-changing initiative designed to promote collaborative effort across disciplines to more rapidly reduce mortality rates and ultimately cure various forms of cancer.[1]   MD Anderson has vigorously promoted its Moon Shots initiative publicly and in seeking to involve other organizations and individuals to support and collaborate with respect to this initiative.  In 2013, a group from MD Anderson, including Dr. DePinho, personally presented the underpinnings of the initiative to billionaire entrepreneur and surgeon (although not an oncologist) Dr. Patrick Soon-Shiong (Soon-Shiong) seeking funding and collaboration for MD Anderson's efforts.  At the time, Soon-Shiong was using the term "Rocket Ship" for his plan of treating cancer, about a year after MD Anderson had widely publicized its Moon Shots initiative (of which Soon-Shiong was undoubtedly aware).  Soon-Shiong initially proposed to help fund various cancer initiatives throughout the country, including in response to an MD Anderson proposal where some funds would be used to support its Moon Shots initiative.  Soon-Shiong did not follow through on the Moon Shots funding, but he used the information he learned from MD Anderson to co-opt the Moon Shots concept and

---

[1]      The initiative was inspired by President Kennedy's 1962 speech at Rice University initiating a national effort to land on the moon by the end of the decade.  Dr. DePinho announced MD Anderson's Moon Shots initiative at a press conference on September 21, 2012, and identified the first six cancer types to receive the focus of a collaborative moon shot effort.  The Moon Shots initiative has garnered significant, positive press attention over the years since its announcement in 2012.  In October 2015, building on the success of the Moon Shots initiative, MD Anderson announced the addition of six more cancer types to the initiative, bringing the total number of Moon Shots to twelve cancer types.  As of May 2016, MD Anderson had received over $380 million in philanthropic commitments to the Moon Shots initiative, as well as  hundreds of millions of dollars in research funding.

2

trademarks for his own commercial use.  Later, Soon-Shiong changed the name of his program to Moonshot and Cancer Moonshot.

3.     MD Anderson also had multiple opportunities to share the details of the Moon Shots initiative with Vice President Joe Biden, who for a variety of reasons, some of them personal, is keenly interested in expediting the progress of science and finding cures for cancer. In a Rose Garden speech in October 2015, the Vice President announced a national Cancer Moon Shot initiative, which complimented MD Anderson's initiative.  Based upon MD Anderson's multiple years of experience with its Moon Shot initiative, MD Anderson has collaborated with and provided input and advice to the Vice President and his team on the development of the national Cancer Moon Shot initiative.  Effective within weeks of the Rose Garden speech, MD Anderson licensed the various "Moon Shots" marks to the United States Department of Health and Human Services and National Institute of Health for purposes of the national Cancer Moonshot initiative.  President Obama outlined a "Moon Shots" cancer program in his state of the union speech to Congress on January 12, 2016.

4.     What happened the day before the 2016 State of the Union speech and thereafter has led to this lawsuit.  On January 11, 2016, Soon-Shiong and his for-profit companies held a press conference to publicly announce their own "Moon Shot" cancer programs, implying that it was aligned with the soon-to-be-unveiled government initiative.  In fact, Soon-Shiong circulated a draft press release that falsely claimed association with various government agencies and falsely trumpeted affiliations with numerous health care businesses forcing Vice President Biden's office to clarify that the Soon-Shiong effort was not related to any government initiative.

5.     Nonetheless, confusion in the marketplace was rampant:  "Cancer patients could be forgiven for frustration at the confusion" created by Soon Shiong wrote *The Economist* (1/22/16); Soon-Shiong's initiative "undoubtedly has invoked confusion among the general

3

public and healthcare professionals alike." (www.medscape.com, 1/28/16); "Who's Running the Moonshot (and how many are there)?" (www.immunopatient.com, 1/29/16).   Soon-Shiong intentionally created this confusion in the marketplace through use of MD Anderson's Moon Shots trademarks along with the Cancer Moonshot initiative of the U.S. Government (used by permission from MD Anderson).

6.     Indeed, numerous news articles have noted the confusion created by Soon-Shiong's efforts, which are not philanthropic but nakedly self-enriching.  Also, Soon-Shiong's website, cancermoonshot2020.org, is a blatant infringement of MD Anderson's Moon Shots marks and even confusingly resembles MD Anderson's 2012 domain registration of cancermoonshots.org, creating confusion on a national basis.   In a 2016 interview of Dr. DePinho, the local Houston Fox News affiliate was confused by Soon Shiong's efforts – it used a backdrop with Soon-Shiong's "Cancer Moonshot 2020" mark for a segment of Dr. DePinho's interview, thinking Soon-Shiong's use represented the MD Anderson Moon Shots initiative. Soon-Shiong has also used social media to further his misappropriation, including use of "@cancermoonshot," leaving MD Anderson to use the inferior account "@cancermoonshot1," even though MD Anderson's use of the Moon Shot marks undeniably pre-date Dr. Soon-Shiong's use by several years.

7.     The infringement is particularly damaging because of the poor reputation of Soon-Shiong.  In November 2015, *The New York Times* published an article focused on the connection between Soon-Shiong and Vice-President Biden, where it was claimed that the "moonshot" phrase was coined by Soon-Shiong when, in fact, the concept and phrase was taken from MD Anderson.  The article noted significant criticism of Soon-Shiong's sharp business practices, including a lawsuit brought by his own brother and a financial relationship between a drug company Soon-Shiong headed and a hospital drug purchaser.  Cancer researchers view him

as a "blowhard," the article noted, with a "deep streak of P.T. Barnum showmanship" based on overselling his ideas. The article quoted a professor of biomedical engineering at Johns Hopkins University as stating that Soon-Shiong makes claims that are "clearly wild exaggerations."

In a November 21, 2016 article in STAT, the following was said about Soon-Shiong:

- He's "a hype merchant propping up a lucrative empire with almost no real substance," Broad Institute geneticist Daniel MacArthur tweeted Monday.

- "Every time I hear his name uttered by an academic oncologist, it's with an eye roll," said Dr. Vinay Prasad, an oncologist at Oregon Health and Science University. "If you asked a dozen oncologists what they think of him, his general reputation is that of a shameless self-promoter."

- Soon-Shiong is "a controversial figure," said Dr. John Halamka, chief information officer at Beth Israel Deaconess Medical Center. "People in the field worry that he over-promises and under-delivers," Halamka said in an email. "There has been great marketing but limited production use of [NantHealth's] services."

8.       In short, Soon-Shiong's career has been characterized by extravagant claims, controversy and self-dealing. During the late 1990s, he was sued multiple times by investors over allegations that, as an officer of a medical startup, Soon-Shiong misappropriated millions of dollars of assets and resources for his own benefit and the benefit of other companies he controlled. In connection with this litigation, Soon-Shiong's own brother, on behalf of VivoRx, the medical startup, filed a complaint against Soon-Shiong alleging:

> . . . . betrayal, arrogance, greed and personal aggrandizement that resulted in corporate misconduct of enormous proportions. From the outset, Patrick [Soon-Shiong] swindled his brother and VI [VivoRx] to obtain the technology to start his own company . . . and then embarked upon a course of deceit, fraud and intentional concealment in utter disregard of his fiduciary duty to the VI companies in furtherance of his own separate interests.

Soon-Shiong reportedly settled these lawsuits with a payment in excess of $30 million.

9.       In 2003, Soon-Shiong was involved in several lawsuits containing allegations that materially false and misleading representations had been made in connection with the clinical trials testing of the drug, Abraxane. More recently, in connection with the 2015 IPO of

NantKwest, the first entity under Soon-Shiong's Nant umbrella to go public, Soon-Shiong received a payday that, at $330 million, made him the highest compensated U.S. executive for 2015.  NantKwest's stock has since declined by 75%, driven by losses and  lawsuits filed against the company, Soon-Shiong and others alleging that the offering documents contained material misrepresentations and omissions in connection with Soon-Shiong's compensation, highlighting significant material weaknesses in the company's internal controls, and determining that Soon-Shiong and the other individual defendants either purposefully intended to deceive investors or that they "acted with reckless disregard for the truth."

10.     Most recently, Soon-Shiong's company, NantHealth, was sued in a Florida whistle blower action replete with allegations of fraud involving government matching funds.  The plaintiffs in that case claimed they had warned NantHealth, prior to its planned IPO, that its "products were defective and posed significant patient safety, compliance and security risks," and that NantHealth's Gap Analysis report, commissioned by Soon-Shiong himself, concluded that NantHealth's Clinical Operating System platform "is ten (10) years behind in technology capability" and was not ready for the much hyped "large enterprise use, much less cloud deployment."  NantHealth's IPO took place in June 2016 and the stock is down 16% since.

11.     Despite significant investor losses and the highly questionable efficacy of Nant products, Soon-Shiong now intends to take two additional Nant companies, NantBiosciences and NantOmics, public.  His NantWorks empire has accumulated a fortune estimated by *Forbes* at $23.5 billion.

12.     MD Anderson's sterling reputation as a philanthropic-directed institution devoted to finding a cure for cancer is being damaged by the confusion in the marketplace created by Soon-Shiong's misappropriation of MD Anderson's Moon Shots marks.  Soon-Shiong recently had dinner with President-Elect Trump, ostensibly to influence government action in his favor,

and perhaps to take over lead of the national Moonshots initiative and to mitigate the misappropriation of MD Anderson's Moon Shots marks.   Unless the infringing actions complained of here are stopped, MD Anderson's reputation will continue to be soiled and funding reduced by likely false association with a highly controversial figure whose reputation is that of a greedy, if not shady, billionaire businessman who oversells his ideas and falsely takes credit for other's work.

13.    For example, the very day this lawsuit was filed, Soon-Shiong tweeted the following:



## PARTIES

14.    Plaintiff The University of Texas MD Anderson Cancer Center by and through The Board of Regents of The University of Texas System (Plaintiff) is a state board established for governing The University of Texas System, a Texas state agency, with its principal place of business at 201 West 7th Street, Austin, Texas 78701.

15.    Upon information and belief, Defendant NantHealth, Inc. f/k/a Nant Health, LLC (Nant Health) is a Delaware corporation with its principal place of business at 9920 Jefferson

Boulevard, Culver City, California 90230. Upon further information and belief, Nant Health converted itself from a Delaware limited liability company (i.e., Nant Health, LLC) to a Delaware corporation (i.e., NantHealth, Inc.) in or about June 1, 2016, while the acts giving rise to Plaintiff's claims alleged herein were ongoing; and that the two entities are one in the same for all purposes herein.

16. Upon information and belief, Defendant NantWorks, LLC (Nant Works) is a Delaware limited liability company with its principal place of business at 9920 Jefferson Boulevard, Culver City, California 90230.

17. Upon information and belief, Defendant Nant Holdings IP, LLC (Nant Holdings IP) is a Delaware limited liability company with its principal place of business at 9920 Jefferson Boulevard, Culver City, California 90230.

18. Upon information and belief, Defendant Dr. Patrick Soon-Shiong (Soon-Shiong) is an individual citizen and resident of California.

19. Nant Health, Nant Works, Nant Holdings IP, and Soon-Shiong are sometimes referred to herein each as a Defendant and collectively as Defendants.

## JURISDICTION AND VENUE

### Subject Matter Jurisdiction

20.     This Court has federal question jurisdiction over Plaintiff's false association claim because this action involves trademarks and arises under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.* (the Lanham Act).  15 U.S.C. § 1121(a); 28 U.S.C. §§ 1331 & 1338(a).

21.     Additionally, this Court has supplemental jurisdiction over Plaintiff's state law claims because they are so related to Plaintiff's other claims in this lawsuit that they form part of the same case or controversy.  28 U.S.C. § 1367(a).

### Personal Jurisdiction

22.     Upon information and belief, and as alleged in further detail herein, each Defendant is subject to personal jurisdiction in Texas because he/it has established minimum contacts with Texas, and the exercise of jurisdiction over him/it does not offend traditional notions of fair play and substantial justice.

23.     More specifically, upon information and belief, Soon-Shiong is the founder and central figure of Nant Health, Nant Holdings IP, and Nant Works (each a Nant Entity and collectively the Nant Entities), which are part of a consortium of closely-held and/or closely-related entities owned, operated, directed, and/or controlled by Soon-Shiong, which conduct business in the cancer research and treatment industries, and whose activities in or in relation to Texas give rise, in whole or in part, to the claims alleged herein.  Additionally, Defendants committed an intentional act expressly aimed and directed at Texas, which caused serious harm, the brunt of which was suffered and which Defendants intended and knew was highly likely to be suffered in Texas.

24.     Additionally, upon information and belief, Nant Health is the Nant Entity that provides the services associated with the Junior Marks (defined below) at issue in this lawsuit.

Upon further information and belief, Nant Health's contacts with Texas are substantial, continuous, and systematic because it regularly conducts and solicits business within Texas; rents or leases office space and derives substantial revenue from its services and other business activities within Texas; actively promotes the fact that it has an office(s) within Texas, including on its publicly available website; employs and/or solicits the employment of individuals to work in Texas in furtherance of its services and other business activities within Texas; has customers located within Texas; markets its services directly to customers and/or potential customers located within Texas; engages in other persistent courses of conduct within Texas; regularly and systematically directs its business activities into Texas with the manifest intent of engaging in business within Texas; and has registered with the Texas Secretary of State to do business in Texas as a foreign entity, with such registration being under its former name (Nant Health, LLC) and still active.  Upon further information and belief, through its close relationship with the other Defendants and its own unauthorized use – jointly with one or more of the other Defendants and/or severally – of the Junior Marks (defined below) at issue in this lawsuit, Nant Health has also willfully, intentionally, and/or knowingly infringed or otherwise violated the trademark rights of Plaintiff in the Senior Marks (defined below) at issue in this lawsuit within Texas, such that it has purposefully directed its activities towards Texas and/or has expressly aimed such tortious conduct at Texas residents.

     25.    Moreover, upon information and belief, Nant Works is the parent of Nant Health – and possibly even Nant Holdings IP – having power and control over the activities of Nant Health – and, again, possibly Nant Holdings IP – in relation to the use of the Junior Marks (defined below) at issue in this lawsuit; and it is also making an unauthorized use of those Junior Marks as complained of herein.  Upon further information and belief, through its close relationship with the other Defendants, its direction and/or control of the other Nant Entities, and

its own unauthorized use – jointly with one or more of the other Defendants and/or severally – of the Junior Marks (defined below) at issue in this lawsuit, Nant Works has also willfully, intentionally, and/or knowingly infringed or otherwise violated the trademark rights of Plaintiff in the Senior Marks (defined below) at issue in this lawsuit within Texas, such that it has purposefully directed its activities towards Texas and/or has expressly aimed such tortious conduct at Texas residents.

26.     Furthermore, upon information and belief, Nant Holdings IP is an intellectual property holding company that purportedly owns the Junior Marks (defined below) at issue in this lawsuit, and that licenses the use of those Junior Marks to the other Defendants.  Upon further information and belief, through its close business and licensing relationships with the other Defendants, and through its license of those Junior Marks to the other Defendants (which includes the right to supervise and control the other Defendants' respective use of those Junior Marks, the right to join in the decisions of how and where the other Defendants may respectively use those Junior Marks, and/or the right to receive financial and/or other benefits from the other Defendants' respective use of those Junior Marks), Nant Holdings IP has – jointly with one or more of the other Defendants and/or severally – willfully, intentionally, and/or knowingly infringed or otherwise violated the trademark rights of Plaintiff in the Senior Marks (defined below) at issue in this lawsuit within Texas, such that it has purposefully directed its activities towards Texas and/or has expressly aimed such tortious conduct at Texas residents.

27.     Finally, upon information and belief, Soon-Shiong, through his close relationship with the other Defendants, through his direction and control over the other Defendants and their respective unauthorized uses of the Junior Marks (defined below) at issue in this lawsuit, and through his own unauthorized use – jointly with one or more of the other Defendants and/or severally – of those Junior Marks, has willfully, intentionally, and/or knowingly infringed or

11

otherwise violated the trademark rights of Plaintiff in the Senior Marks (defined below) at issue in this lawsuit within Texas, such that he has purposefully directed his activities towards Texas and/or has expressly aimed such tortious conduct at Texas residents.

**Service of Process**

28.     Nant Health may be served with process as provided by FED. R. CIV. P. 4(c), 4(e)(1), and 4(h)(1)(A)-(B), as effected pursuant to TEX. R. CIV. P. 106(a)(2) and 108, by personal service or U.S. Certified Mail, Return Receipt Requested to the last known residence or usual place of business of Nant Health's Chief Executive Officer, Soon-Shiong, at 9920 Jefferson Boulevard, Culver City, California 90230, to the last known residence or usual place of business of Nant Health's Registered Agent for Service of Process in Texas, National Registered Agents, Inc., 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136, and/or to the last known residence or usual place of business of Nant Health's Registered Agent for Service of Process in California, National Registered Agents, Inc., 818 W. Seventh Street, Suite 930, Los Angeles, California 90017.  Nant Health was served with process on October 28, 2016.

29.     Nant Works may be served with process as provided by FED. R. CIV. P. 4(c), 4(e)(1), and 4(h)(1)(A)-(B), as effected pursuant to TEX. R. CIV. P. 106(a)(2) and 108, by personal service or U.S. Certified Mail, Return Receipt Requested to the last known residence or usual place of business of Nant Works' Chief Executive Officer,  Soon-Shiong, at 9920 Jefferson Boulevard, Culver City, California 90230, and/or to the last known residence or usual place of business of Nant Works' Registered Agent for Service of Process in California, National Registered Agents, Inc., 818 W. Seventh Street, Suite 930, Los Angeles, California 90017.  Nant Works was served with process on October 28, 2016.

30.     Nant Holdings IP may be served with process as provided by FED. R. CIV. P. 4(c), 4(e)(1), and 4(h)(1)(A)-(B), as effected pursuant to TEX. R. CIV. P. 106(a)(2) and 108, by

personal service or U.S. Certified Mail, Return Receipt Requested to the last known residence or usual place of business of Nant Holdings IP's Officer or Manager, Charles N. Kenworthy, at 9920 Jefferson Boulevard, Culver City, California 90230, and/or to the last known residence or usual place of business of Nant Holdings IP's Registered Agent for Service of Process in California, National Registered Agents, Inc., 818 W. Seventh Street, Suite 930, Los Angeles, California 90017. Nant Holdings IP was served with process on October 28, 2016.

31.     Soon-Shiong may be served with process as provided by FED. R. CIV. P. 4(c) and 4(e)(1), as effected pursuant to TEX. R. CIV. P. 106(a)(2) and 108, by personal service or  U.S. Certified Mail, Return Receipt Requested to his last known residence, dwelling, or usual place of abode in California; and/or as provided by FED. R. CIV. P. 4(c) and 4(e)(2)(A) by delivering a copy of the summons and this complaint to him personally wherever he may be found. Soon-Shiong was personally served with process on November 17, 2016.

## Venue

32.     Venue is proper in this judicial district because a substantial part of the events or omissions giving rise to the claims occurred or will occur, and/or a substantial part of the property that is the subject of this action (namely, Plaintiff's trademarks) are situated, in this judicial district.  28 U.S.C. § 1391(b)(2).

13

## STATEMENT OF FACTS

### The University of Texas M. D. Anderson Cancer Center

33.     The Board Of Regents of The University Of Texas System (Board) operates a system of world class universities and related institutions throughout Texas, including The University of Texas M. D. Anderson Cancer Center (MD Anderson) in Houston, Texas.  The powers and duties of the Board are set forth generally at Chapter 65 of the Texas Education Code, TEX. EDUC. CODE § 65.01 *et seq.*, and specific authority to manage and control MD Anderson is conferred upon Plaintiff by Chapter 73, Subchapter C, of the Texas Education Code, TEX. EDUC. CODE § 73.101 *et seq.*  Therefore, for purposes herein, the Board and MD Anderson are one and the same.  MD Anderson's home page is located at www.MDAnderson.org and MD Anderson uses www.CancerMoonshots.org, among other means, to promote its MOON SHOTS<sup>TM</sup> Program, which is explained in more detail herein.

34.     Cancer is one of the leading causes of death in the United States of America. Established seventy-five years ago, MD Anderson is the largest freestanding cancer center in the world and one of the world's most respected centers devoted exclusively to cancer patient care, research, education, and prevention.   MD Anderson is one of the nation's original three comprehensive cancer centers designated by the National Cancer Act of 1971, and has ranked as one of the top two hospitals in cancer care every year since U.S. News & World Report began its annual "America's Best Hospitals" survey in 1990.  MD Anderson has received the top ranking in nine of the last ten years.

35.     Since opening its doors, MD Anderson has treated more than one million patients, including more than 135,000 in 2015 alone.  Approximately one-third of new patients arrive at MD Anderson from outside of Texas.  MD Anderson receives the largest amount of total funding of grants given by the National Cancer Institute.   In the previous fiscal year, MD Anderson

invested more than $780 million in research and trained over 6,600 physicians, scientists, nurses, and allied health professionals.

36.     MD Anderson has achieved recognition as a leading provider of cancer-related services.  MD Anderson's cancer-related services are provided on a national and international basis, and include the following (collectively, the <u>Plaintiff Services</u>):

       a.     educational services designed to inform and educate patients, patients' families, medical care providers, and the public on the prevention, treatment, and management of cancer;

       b.     medical services pertaining to cancer, including early detection, treatment, management, and prevention of cancer;

       c.     providing medical news and information, particularly in the field of healthcare and cancer treatment, in print and electronically such as through one or more websites;

       d.     medical research services pertaining to cancer;

       e.     promoting collaboration within the scientific, research, pharmaceutical, and medical communities to achieve advances in the field of healthcare, including to accelerate the development and use of immunotherapy in cancer treatment; and

       f.     charitable fundraising services for promoting and funding the foregoing.

### Plaintiff's Senior Marks

37.     At least as early as Fall 2012, MD Anderson launched its MOON SHOTS™ Program to more rapidly convert scientific discoveries into lifesaving advances in treating cancer.

38.     In connection with its MOON SHOTS™ Program, Plaintiff has used the following names and marks (collectively, the <u>Senior Marks</u>) for years:

      a.     The name and mark MOON SHOTS™ for use in connection with the Plaintiff Services;

      b.     The name and mark MOON SHOT™ for use in connection with the Plaintiff Services;

      c.     The name and mark MOON SHOTS PROGRAM™ for use in connection with the Plaintiff Services; and

      d.     The name and mark CANCERMOONSHOTS.ORG™ for use in connection with the Plaintiff Services.

39.    MD Anderson is a rare institution with the critical mass of talent and resources to drive the entire cancer therapy field toward new models of care delivery, treatment, and research. MD Anderson's MOON SHOTS™ Program for cancer resulted from MD Anderson's strategic planning for aggressively attacking cancer with the goal of reducing and eventually eliminating cancer. The strategic framework of MD Anderson's MOON SHOTS™ Program includes: establishing an innovative clinical care model for bringing medicine, science, and technology together; expanding MD Anderson's network and knowledge in order to better share knowledge and improve the United States' and the world's standard of care; providing and facilitating transformative, sustainable, and accountable research fueled by the insights of multidisciplinary teams; and establishing a comprehensive charitable fund raising platform under its MOON SHOTS™ Program in an effort to provide the financial resources to accomplish the forgoing.

40.    In the MOON SHOTS™ Program's first year, MD Anderson identified eight (8) cancer "platforms" and focused on six (6) for immediate or near reachable goals for reducing cancer with expanding goals of eliminating all types of cancer with research and gains in technology and treatments. The initial list of the six (6) cancer types was later expanded to twelve (12) types. Included with the MOON SHOTS™ Program for cancer is the APOLLO

(Adaptive Patient-Oriented Longitudinal Learning and Optimization) program, which combines more than one million patients' medical histories and data, research data, and clinical knowledge to help determine the best treatment decisions for each patient.  MD Anderson linked its database information with one of the world's most powerful computers, IBM Watson, to use cutting-edge analytics technology to analyze and rank potential treatment options based on up-to-date evidence from the massive accumulation of records.  To support the massive research and focus, MD Anderson sought charitable donations throughout the country by advertising and promoting its MOON SHOTS<sup>TM</sup> Program for cancer and requesting financial help.  MD Anderson's large scale charitable contribution campaigns contacted corporations, private foundations and funds, and specific individuals throughout the United States.  Philanthropic commitments to the MOON SHOTS<sup>TM</sup> Program total more than $380 million dollars as of May 2016.

41.     Prior to launching the MOON SHOTS<sup>TM</sup> Program, in or about August 9, 2012, Plaintiff registered and has since maintained the internet domain name "CancerMoonshots.org;" and Plaintiff made the associated website publicly available at least by September 24, 2012 with use of the Senior Marks.  The domain name "CancerMoonshots.org" is used in association with Plaintiff's website located at http://www.CancerMoonshots.org.  Plaintiff uses this site, among other things, to provide the Plaintiff Services in connection with its Senior Marks.

42.     Since launching the MOON SHOTS<sup>TM</sup> Program, MD Anderson has routinely published press releases about its MOON SHOTS<sup>TM</sup> Program and cancer related news and information that are routinely accepted by various publications and news sources in electronic and print versions and disseminated around the country and the world.

43.     MD Anderson has also provided MOON SHOTS<sup>TM</sup> news and other information related to cancer to its widespread donor base, the media, patients and potential patients, the public, peer institutions, governmental agencies, corporate partners, and others throughout the

United States of America through press conferences and/or its multiple publications.  In print form alone, MD Anderson's Annual Report publications, starting with the Fiscal Year 2013 Spring renewal mailings through the Fiscal Year 2015 Fall follow-up mailing, reference MD Anderson's MOON SHOTS[TM] Program for cancer and were distributed to over 1.5 million Annual Fund donors and prospects throughout the nation.  All of these Annual Reports and follow-up mailings during that 2013-2015 period occurred prior to Nant Holdings IP's filing of the Defendant Applications (defined below).  In another example, a specific 2015 MOON SHOTS[TM] Program update to donors was mailed to 1.25 million people throughout the nation.

44.    MD Anderson has also held special events, seminars, in-person briefings, press conferences, and receptions to promote its MOON SHOTS[TM] cancer-related efforts.

45.    MD Anderson has sponsored a MOON SHOTS[TM] YouTube video at https://www.youtube.com/watch?v=DnCubw7xfSY, which has been widely viewed by more than 25,000 individuals.

46.    To help the research and development efforts and carry out the goals of its MOON SHOTS[TM] Program, MD Anderson has also promoted the MOON SHOTS[TM] Program with requests for charitable donations from its donor base and the public at large in newsletters, brochures, postcards, and other mailings.

47.    In summary, for multiple years in the applicable categories through the present and without abandonment, Plaintiff has advertised, promoted, marketed, and offered the Plaintiff Services under the Senior Marks.

48.    Through such years of substantial and continuous use, Plaintiff has acquired senior valid, subsisting, and continuous trademark rights and associated goodwill in and to the Senior Marks.  Accordingly, Plaintiff is the exclusive owner of all rights, titles, and interests throughout the United States of America in and to the Senior Marks, together with all goodwill

18

of the business(es) connected with the use of and symbolized by the Senior Marks, which are of significant value.

**Defendants and Their Unauthorized Junior Marks and Applications for Registration**

49.     In or about the latter part of 2015 and/or early 2016, Defendants, jointly and/or severally, began using, directing the use of, and/or claiming rights in several names and marks which make prominent use of the terms MOONSHOT or CANCER MOONSHOT (collectively, the Junior Marks) in connection with cancer-related research, informational, and fundraising services (collectively, the Defendant Services).  For purposes hereof, the Junior Marks include the name and mark CANCER MOONSHOT 2020 (words), the name and mark CANCER MOONSHOT 2020 FOUNDATION (words), and the name and mark CANCER MOONSHOT NETWORK NEWS (words), and, upon information and belief, may also include several variations of the foregoing (words and/or designs).  The Junior Marks also include the following stylized version and design of the CANCER MOONSHOT 2020 name and mark:



50.     Soon thereafter, Nant Holdings IP began filing applications for federal registration of certain Junior Marks with the United States Patent & Trademark Office (collectively, the Defendant Applications).  The Subject Applications include the following:

a.     United States Trademark Application Serial No. 86/891,907, filed on or about January 29, 2016 as a use-based application (Section 1A), for the mark CANCER MOONSHOT 2020 (words) for use in connection with "[p]romoting collaboration within the scientific, research, pharmaceutical, provider, and payer communities to accelerate the

development and use of immunotherapy and genomic sequencing in cancer treatment," in Class 35 (the '907 Application);

b.      United States Trademark Application Serial No. 86/920,849, filed on or about February 26, 2016 as an intent-to-use application (Section 1B), for the mark CANCER MOONSHOT 2020 FOUNDATION (words) for use in connection with "[c]haritable fundraising services," in Class 36 (the '849 Application); and

c.      United States Trademark Application Serial No. 86/921,078, filed on or about February 26, 2016 as an intent-to-use application (Section 1B), for the mark CANCER MOONSHOT NETWORK NEWS (words) for use in connection with "[p]roviding news and information in the field of medicine, healthcare, and cancer treatment," in Class 44 (the '078 Application).

51.      Upon information and belief, Defendants, jointly and/or severally, did not make a trademark use of the Junior Marks in 2012.

52.      Upon information and belief, Defendants, jointly and/or severally, did not make a trademark use of the Junior Marks in 2013.

53.      Upon information and belief, Defendants, jointly and/or severally, did not make a trademark use of the Junior Marks in 2014.

54.      Upon information and belief, Defendants, jointly and/or severally, did not make a trademark use of the Junior Marks in 2015.

55.      The Junior Marks, including those made subject to the Defendant Applications, are so similar to Plaintiff's Senior Marks that they are likely to cause confusion, mistake, and/or deception, all to the irreparable harm of Plaintiff, the Senior Marks, and their associated goodwill.

56.     The Defendant Applications do not state any restrictions as to the classes of consumers for the services identified therein.  Upon information and belief, the Defendant Services, including those identified in the Defendant Applications, have been offered, are being offered, and/or will be offered under or in connection with the Junior Marks to the same, substantially similar, and/or overlapping classes of consumers as those who come into contact with Plaintiff's Senior Marks.

57.     The Defendant Applications do not state any restrictions as to the channels of trade for the services identified therein.  Upon information and belief, the Defendant Services, including those identified in the Defendant Applications, have been offered, are being offered, and/or will be offered under or in connection with the Junior Marks through the same, substantially similar, and/or overlapping channels of trade as those through which Plaintiff offers the Plaintiff Services under or in connection with the Senior Marks.

58.     Plaintiff's use of its Senior Marks is senior to Defendants' use of the Junior Marks; Defendants' use of the Junior Marks is made without Plaintiff's consent; and Defendants' use of the Junior Marks has been made with knowledge of Plaintiff and the Senior Marks.

**CAUSES OF ACTION**

<u>**Count 1 – Violation of Section 43(a) of the Lanham Act By False Association**</u>

59.     Plaintiff repeats and incorporates herein by reference the allegations above.

60.     Plaintiff alleges this Count 1 against Defendants for violations of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) (<u>Section 43(a) of the Lanham Act</u>), by false association.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1384 (2014) ("Section 1125(a) thus creates two distinct bases of liability:  false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B).").

21

61.     Defendants' joint and/or several use in commerce of the Junior Marks in connection with the Defendant Services and/or as a false designation of origin is without Plaintiff's consent and likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendant(s) with Plaintiff, as to the origin, sponsorship, or approval of the Defendant Services or commercial activities by Plaintiff.  Such acts constitute violations of Section 43(a), and Plaintiff has been and will continue to be injured as a result.

62.     Accordingly, Plaintiff seeks an award of Defendants' respective profits and any actual damages sustained by Plaintiff, as well as an enhancement of the amounts found as actual damages not exceeding three times such amounts.  15 U.S.C. § 1117(a).  Alternatively, Plaintiff seeks an award of nominal damages.

63.     Plaintiff also seeks the delivery and destruction of all articles, including Defendants' marketing materials, which make use of the Junior Marks in a manner that violates Section 43(a) of the Lanham Act as alleged above.  15 U.S.C. § 1118.

64.     Additionally, Plaintiff seeks preliminary and permanent injunctive relief restraining Defendants from further violating Section 43(a) of the Lanham Act in the manners alleged above because: (a) Plaintiff has suffered and/or will suffer an irreparable injury; (b) other remedies available at law, such as monetary damages, are inadequate to fully compensate Plaintiff for that injury; (c) a remedy in equity is warranted; and (d) the public interest will not be disserved by an injunction, permanent or otherwise.  15 U.S.C. § 1116(a).

65.     Plaintiff also seeks preliminary and permanent injunctive relief restraining Defendants from further pursuing the '907 Application, the '849 Application, and the '078 Application and otherwise allowing those applications to mature into federal trademark registrations because: (a) Plaintiff has suffered and/or will suffer an irreparable injury; (b) other remedies available at law, such as monetary damages, are inadequate to fully compensate

Plaintiff for that injury; (c) a remedy in equity is warranted; and (d) the public interest will not be disserved by an injunction, permanent or otherwise.

66.     Upon information and belief, Defendants' alleged misconduct is willful, intentional, and/or conducted in bad faith, thereby rendering this case exceptional within the meaning of Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).  Thus, Plaintiff also seeks an award of its reasonable attorney fees for this action and any appeals thereof pursuant to applicable law.

67.     Plaintiff also seeks an award of its costs for this action and any appeals thereof pursuant to applicable law.  *See* 15 U.S.C. § 1117(a); *see* FED. R. CIV. P. 54(d)(1).

68.     Finally, Plaintiff seeks pre- and post-judgment interest on the principal amounts it recovers for this action and any appeals thereof pursuant to applicable law.

### Count 2 – Common Law Trademark Infringement

69.     Plaintiff repeats and incorporates herein by reference the allegations above.

70.     In addition to and/or in the alternative to Count 1 above, and to the extent applicable, Plaintiff alleges this Count 2 against Defendants for common law trademark infringement.

71.     The Senior Marks are subject to common law trademark protection under the laws of the State of Texas.

72.     Defendants' joint and/or several use of the Junior Marks in connection with the provision, offering to provide, marketing, and/or advertising of the Defendant Services is without Plaintiff's consent and likely to deceive or cause confusion or mistake as to the source of origin of the services.  Such acts constitute common law trademark infringement, and Plaintiff has been and will continue to be injured as a result.

73.     Accordingly, Plaintiff seeks an award of actual damages resulting from Defendants' acts of infringement.  Alternatively, Plaintiff seeks an award of nominal damages.

74.     Plaintiff also seeks an award of exemplary damages in an amount to be determined at trial because, upon information and belief, the harm caused by Defendants as alleged herein results from Defendants' malice or gross negligence.  TEX. CIV. PRAC & REM. CODE § 41.003(a).

75.     Moreover, Plaintiff seeks preliminary and permanent injunctive relief restraining Defendants from further infringing the Senior Marks in the manners alleged above, because: (a) Plaintiff has suffered and/or will suffer an irreparable injury; (b) other remedies available at law, such as monetary damages, are inadequate to fully compensate Plaintiff for that injury; (c) a remedy in equity is warranted; and (d) the public interest will not be disserved by an injunction, permanent or otherwise.

76.     Plaintiff also seeks preliminary and permanent injunctive relief restraining Defendants from further pursuing the '907 Application, the '849 Application, and the '078 Application and otherwise allowing those applications to mature into federal trademark registrations because: (a) Plaintiff has suffered and/or will suffer an irreparable injury; (b) other remedies available at law, such as monetary damages, are inadequate to fully compensate Plaintiff for that injury; (c) a remedy in equity is warranted; and (d) the public interest will not be disserved by an injunction, permanent or otherwise.

77.     Furthermore, Plaintiff seeks an award of its costs for this action and any appeals thereof pursuant to applicable law.

78.     Finally, Plaintiff seeks pre- and post-judgment interest on the principal amounts it recovers for this action and any appeals thereof pursuant to applicable law.

**Count 3 – Declaratory Judgement Against Defendants Concerning the Junior Marks**

79.     Plaintiff repeats and incorporates herein by reference the allegations above.

80.     An actual justiciable controversy exists as to the rights and status of the parties, namely, (a) whether Plaintiff's trademark rights in the Senior Marks are senior to Defendants' purported trademark rights in the Junior Marks, (b) whether Defendants' joint and/or several use of the Junior Marks in connection with the Defendant Services is likely to cause confusion, or to cause mistake, or to deceive with respect to Plaintiff's Senior Marks, thereby damaging Plaintiff, the Senior Marks, and their associated goodwill, and (c) whether Nant Holdings IP's '907 Application, the '849 Application, and the '078 Application should mature into federal trademark registrations.

81.     Accordingly, pursuant to 28 U.S.C. § 2201, Plaintiff seeks the following declaratory judgment or decree:

        a.      a declaration that Plaintiff's trademark rights in the Senior Marks are senior to Defendants' purported trademark rights in the Junior Marks throughout the United States of America;

        b.      a declaration that Plaintiff is entitled to continue using the Senior Marks in connection with the Plaintiff Services and any natural expansions thereof throughout the United States of America, without interference from Defendants jointly and/or severally;

        c.      a declaration that Defendants' joint and/or several use of the Junior Marks in connection with the Defendant Services is likely to cause confusion, or to cause mistake, or to deceive with respect to Plaintiff's Senior Marks; and

        d.      a declaration that, in light of the foregoing, the Senior Marks identified in the '907 Application, the '849 Application, and the '078 Application are not entitled to

registration with the United States Patent & Trademark Office, *see* 15 U.S.C. §§ 1502(d), 1063. *See also* 15 U.S.C. § 1119.

82.   Upon information and belief, the requested declaration or decree will resolve the justiciable controversy at hand.

83.   In addition to the foregoing declaratory judgment or decree, Plaintiff seeks an award of its reasonable attorney fees from this action and any appeals thereof pursuant to applicable law because, upon information and belief, Defendants' alleged misconduct is willful, intentional, and/or conducted in bad faith, thereby rendering this case exceptional within the meaning of Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a). *See* 28 U.S.C. § 2202.

84.   Plaintiff also seeks an award of its costs for this action and any appeals thereof pursuant to applicable law.  *See* 15 U.S.C. § 1117(a); *see* 28 U.S.C. § 2202; *see* FED. R. CIV. P. 54(d)(1).

85.   Finally, Plaintiff seeks pre- and post-judgment interest on the principal amounts it recovers for this action and any appeals thereof pursuant to applicable law.

## CONDITIONS PRECEDENT

86.   All conditions precedent to Plaintiff's claims have occurred or been performed.

## JURY DEMAND

87.   Plaintiff hereby demands a jury trial on all triable issues.  FED. R. CIV. P. 38(b).

## PRAYER

88.   For these reasons, Plaintiff respectfully asks this Court for the following relief:

  a.   a judgment in favor of Plaintiff on Counts 1, 2, and/or 3 above;

  b.   a declaration of rights as further described in Count 3 above;

  c.   an award of profits and/or actual damages according to law, or, alternatively, an award of nominal damages according to law;

d.   the enhancement of any amounts of profits and/or actual damages awarded according to law;

e.   an award of exemplary damages according to law;

f.   the delivery and destruction of all infringing articles according to law;

g.   preliminary, permanent and mandatory injunctive relief against Defendants according to law, and as described further above;

h.   an award of attorney fees according to law;

i.   an award of costs according to law;

j.   pre- and post-judgment interest according to law; and/or

k.   such other and further relief as this Court may deem just and proper.

Dated:  November 30, 2016

Respectfully submitted,

*JACKSON WALKER LLP*

By:  */s/ Charles L. Babcock*
        Charles L. Babcock
        TXBN 01478500
        SDTXBN 10982
        *Attorney-in-Charge*

        John K. Edwards
        TXBN 24002040
        SDTXBN 21645
        D. Brit Nelson
        TXBN 14888660
        SDTXBN 23680
        William J. Stowe
        TXBN 24075124
        SDTXBN 1138801
        1401 McKinney Street, Suite 1900
        Houston, Texas 77010
        (713) 752-4200 – Telephone
        (713) 752-4221 – Facsimile
        cbabcock@jw.com;
        jedwards@jw.com;
        bnelson@jw.com;
        wstowe@jw.com

Carl C. Butzer
TXBN 03545900
SDTXBN 16376
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
(214) 953-6000 – Telephone
(214) 953-5822 – Facsimile
cbutzer@jw.com

Emilio B. Nicolas
TXBN 24058022
SDTXBN 1151680
100 Congress Avenue, Suite 1100
Austin, Texas 78701
(512) 236-2000 – Telephone
(512) 236-2002 – Facsimile
enicolas@jw.com

ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on November 30, 2016, a copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, and served upon the following counsel for Defendants in accordance with the Federal Rules of Civil Procedure:

Jeremy Doyle                                                                    ***Via E-Mail***
Solace Southwick
REYNOLDS FRIZZELL LLP
1100 Louisiana, Suite 3500
Houston, Texas 77002
Tel. 713-485-7200
Fax. 713-485-7250
doyle@reynoldsfrizzell.com
ssouthwick@reynoldsfrizzell.com

Michael J. McCue                                                            ***Via E-Mail***
Jonathan W. Fountain
LEWIS ROCA ROTHGERBER CHRISTIE LLP
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169
Tel. (702) 949-8200
Fax. (702) 949-8398
mmccue@lrrc.com
jfountain@lrrc.com

                                                            */s/ John K. Edwards*
                                                            John K. Edwards